FILED

Nov. 25, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

| | | |
|---|---|---|
| **BRENDA BAILEY LOYD,** | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Madison County Chancery No. 41548 |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **WENDELL RAY LOYD,** | ) | Appeal No. 02A01-9504-CH-00084 |
| | ) | |
| Defendant/Appellee. | ) | |

APPEAL FROM THE MADISON COUNTY CHANCERY COURT
AT JACKSON, TENNESSEE

THE HONORABLE JOE C. MORRIS, CHANCELLOR

For the Plaintiff/Appellant:               For the Defendant/Appellee:

Mary Jo Middlebrooks                    Wendell Ray Loyd, Pro Se
Jackson, Tennessee                        Jackson, Tennessee

**REVERSED AND REMANDED**

HOLLY KIRBY LILLARD, JUDGE

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This case involves contempt proceedings brought against Wendell Ray Loyd ("Husband") by Brenda Bailey Loyd ("Ex-Wife") for failure to pay alimony. The trial court found that Husband did not have the present ability to pay and therefore could not be incarcerated for contempt. We reverse and remand for further proceedings.

Husband and Ex-Wife were divorced in 1991. In its Final Decree, the trial court did not award alimony to Ex-Wife. Instead, the court awarded her Loyd's Telephone, Inc., the telephone sales and installation business that she and Husband had run, which the court valued at the time at $287,884. It awarded Husband the marital residence, a car, some shop equipment, and two IRA's worth $11,301.96 each. The court also ordered the parties to equally divide their furniture and appliances and to each pay his own attorney's fees.

Ex-Wife appealed to this Court the division of property and the failure to award her alimony and attorney's fees. *Loyd v. Loyd*, 860 S.W.2d 409, 410 (Tenn. App. 1993). She maintained that she lacked the technical experience to successfully run the business. *Id.* at 412. Ex-Wife also alleged that Husband had drained the business of its value, formed a new telephone sales and installation business, gone into direct competition with her, stolen customers, and not cooperated in transferring to her the assets of Loyd's Telephone, Inc. *Id.* at 410-11.

This Court found in favor of Ex-Wife. *Id.* at 412-13. The business was awarded to Husband, as well as the shop equipment and the car. Ex-Wife was awarded the marital residence, both of the IRA's (or their cash equivalent in the eventuality that Husband had liquidated them), and $99,000, as an equitable distribution of the marital estate. Husband was ordered to pay the $99,000 awarded to Ex-Wife in monthly installments of $412.50 per month. The payments were to begin on May 1, 1993, and continue for either twenty years or until Ex-Wife's death, whichever occurred first. *Id.* at 412. In addition, Ex-Wife was awarded $1,000 per month in alimony, the payments to begin May 1, 1993, and continue until her death or remarriage. *Id.* at 413.

Subsequently, Husband filed a motion asking the trial court to suspend or reduce alimony. One of the supporting reasons for the motion was that Husband's physical problems had resulted in a reduced income, adversely affecting his ability to pay alimony. In response, Ex-Wife filed a motion for contempt, alleging that Husband had failed to make any of the ordered monthly payments, had failed to surrender the IRA in his possession (Ex-Wife already had possession of the other IRA),

had failed to surrender the marital residence, had stripped the marital residence of fixtures and otherwise vandalized it, had failed to pay real estate taxes on the marital residence during the time in which he inhabited it, and had failed to pay a note owed by Loyd's Telephone, Inc., to First American Bank. Ex-Wife also filed a motion to dismiss Husband's petition to reduce or suspend alimony, arguing that Husband was in contempt and that his motion should not be heard until he had purged himself of contempt.

At the hearing on the parties' motions, Ex-Wife testified in support of the allegations in her contempt motion. Husband testified that he had not yet received from Ex-Wife all of the assets of Loyd's Telephone, Inc., and that the marital furniture had not yet been equitably divided. He also testified that he had remarried. His new wife, Kitty Loyd ("Wife"), had bought a house for the two of them, making the down payment out of her own money. The house had been placed solely in Wife's name, and Husband testified that this was done "[b]ecause I didn't want Brenda [Ex-Wife] to get it." Husband also testified that he had previously cashed the IRA in his possession in order to pay accountant's and attorney's fees. Since the divorce, Husband's new business, Modern Telephone Systems, had purchased two vehicles, a van and a new Ford Taurus. He and Wife both drove the Ford Taurus. Husband claimed that his income had declined because he had been having trouble with his back and knees, that he had been unable to pay alimony as a result, and that he was willing to work out a payment plan if the court would allow it.

After the hearing, the trial court wrote a letter to the parties' attorneys. In the letter, the trial judge informed the parties that Husband would have to be brought current on the obligations ordered by the Court of Appeals before his motion to reduce alimony would be considered.

Several months later, Ex-Wife filed another motion asking the trial court to find Husband in contempt. The motion stated that Husband had still failed to make any of the required payments. Ex-Wife alleged that Husband had still not paid anything towards the amount of the IRA that he had cashed, that he had not paid any of the delinquent taxes, and that the note on Loyd's Telephone had not been satisfied. Although Husband had given Ex-Wife possession of the marital residence, Ex-Wife stated that drapes and window shutters had been removed; built-in appliances, light fixtures, and built-in cabinets were removed; the central heat and air unit had been removed and replaced with

2

an inoperable unit that could not be repaired; there was interior damage to the house; and various personal items belonging to Ex-Wife were missing.

At the hearing on the motion for contempt, Husband testified that in September of 1993 he had had surgery on his knees and had been at home recovering for approximately eight weeks, during which time he had been able to do very little work. Husband claimed that he suffered from arthritis in both his knees and hands. There was no medical documentation or other support of Husband's alleged medical problems admitted as evidence at the hearing. Husband also testified that he was the only salesperson for his company and that the pain in his knees, which had continued despite the surgery, made it difficult for him to make service calls. Consequently, his personal income had decreased dramatically, as had the earnings of his business, Modern Telephone Systems. However, when asked on cross-examination why he had made no attempts to pay alimony prior to the onset of his medical problems, Husband said only, "I can't explain it."

Husband testified that he had two employees, besides Wife, to install telephone equipment and handle related work. He also testified that he could drive around town, that he could make sales calls, and that the surgery on his knees had been an arthroscopic procedure. Husband stated that Wife owned half of Modern Telephone Systems and that she earned $250 a week from the company for bookkeeping, driving Husband on out-of-town assignments, and otherwise being of general assistance, all while additionally employed elsewhere.

Ex-Wife testified that she had seen Husband driving around town in the company van. She also testified that, though Husband had been limping in the courtroom, she had seen him walking into the post office the previous day without a limp.

The trial court found Husband in contempt. The court found him in arrears for a period of ten months for the total sum of $14,125 ($1,000 per month in alimony plus $412.50 per month in payments representing the division of marital property). The court ordered Husband to pay the arrearage by a date certain or work out an acceptable payment plan with Ex-Wife. If he failed to do so he would be placed in the county workhouse until he had purged himself of contempt. Husband failed to pay the arrearage or offer any payment plan and was subsequently incarcerated.

After having served a little over two months in the county workhouse, Husband moved for a stay of the court's judgment. The trial court released him on his own recognizance on April 15, 1994, pending further proceedings. A hearing ensued on October 4, 1994.

At this hearing, Husband presented the expert testimony of his accountant, Rex Baker ("Baker"). Baker had prepared a compiled financial statement for the first eight months of 1994 for Wendell Loyd Enterprises, Inc., d/b/a Modern Telephone Systems. According to Baker, the business showed a profit of $1,113 for the first eight months, but due to prior years' losses, the stockholder equity was at a deficit of over $7,000. Baker also presented the corporation's tax returns for 1993 and testified that they revealed that Husband and Wife had been paid a total of $33,024 in salaries during 1993.

Husband testified that he still suffered pain in his knees and his back and was unable to do the physical work demanded by service calls at his business. He claimed that he had undergone a heart catheterization and had tried to slow down since then to keep his stress levels low. He testified further that he injured his left hand in a table saw accident. Husband offered no medical records or other evidence to substantiate these claims.

Husband testified that he valued his business at $55,000 to $60,000. He stated that he had given Wife 50% of the company stock in exchange for a used car worth approximately $2,000. He admitted that Wife drew a salary while employed at two other jobs but explained that both of her other jobs were part-time. Husband stated that, as of the date of the hearing, Wife was working solely for Modern Telephone Systems. He testified that he had recently brought a competitor, Aaron Gilbertson ("Gilbertson"), into the business. In exchange for a work van which Husband valued at about $2,850 and some tools and equipment, Husband gave Gilbertson 33% of the corporation's stock. Gilbertson's 33% share of the stock came out of Husband's share of stock--Wife retained her 50% share. In addition, the company bought Gilbertson a new automobile, but Husband claimed that Gilbertson had agreed to a reduction in salary as a means of paying for the vehicle.

Husband testified that the house he and Wife lived in had been purchased after the Court of Appeals' decision had been filed but that Wife had purchased it with her own money. He admitted

4

that he had paid about $900 or $1,000 in cash for a new fence for the house. Husband also paid approximately $200 in cash for paint and bought $5,000 worth of carpet on credit.

Husband submitted several exhibits indicating his salary and Wife's salary during 1993 and the first eight months of 1994. In addition, he submitted a self-compiled breakdown of his monthly living expenses and his total debts as of October 1, 1994. He submitted an exhibit showing that his monthly expenses, joint with Wife, were $2,868.40 per month and that the total debts for Husband and Wife together were $18,896.79. This list did not include the mortgage on Husband's house, titled in Wife's name, but the house payment was included among Husband's monthly living expenses. Husband testified that after paying their bills each month, he and Wife were left with about $280 surplus from which to pay alimony.

The record in this cause includes the history of Husband's salary and Wife's salary from Modern Telephone. Prior to this Court's previous decision in this case, Husband consistently paid himself $615.05 per week. In July, 1993, approximately three months after this Court entered its previous decision, in which Husband was ordered to begin paying alimony to Ex-Wife, Husband decreased his income from the new business from $615.05 per week to $615.05 per month, with the exception of September 1993, the month of Husband's arthroscopic procedure, in which he paid himself $1,230.10. Husband attributed the decrease in his salary to his physical problems. He continued receiving $615.05 per month through February, 1994, until the trial court ordered him committed to the workhouse for failure to make the payments ordered by this Court. The trial court released Husband on April 14, 1994. In June, 1994, he received a total of $913.91. Thereafter, he began receiving $298.86 per week from his business, nearly twice the salary he made before his incarceration.

Prior to March, 1993, the new business paid Wife $171.42 per week for bookkeeping and assisting Husband, while she also was holding at least one other part-time job. In March 1993, her salary increased to $250 per week. She was not paid for Christmas week in 1993, during which she apparently held seasonal retail employment, but she received a Christmas bonus of $292.37. In August 1994, Wife's salary increased to $430 per week.

5

The trial court took the matter under advisement, made specific findings in a letter dated December 1, 1994, and subsequently, on February 3, 1995, entered an order incorporating those findings:

> "The Court cannot find that Mr. Loyd willfully depleted the business which was previously awarded to Ms. Loyd, since there were no restrictions on Mr. Loyd entering into a competitive business. At the present time, Mr. Loyd does not have sufficient funds to purge himself of contempt, which puts him in the position of owing the arrearage on the alimony payments, but being unable to pay them. The payments on the $99,000 indebtedness are upon a division of property which Ms. Loyd insists has no value.
>
> An IRA was converted during the pendency of this case for which Mr. Loyd is indebted to Ms. Loyd. The Court was not advised of any conversion of this account in a timely manner, by mistake or for whatever reason.
>
> Mr. Loyd is indebted to Ms. Loyd for the unpaid real estate taxes.
>
> There is a note outstanding at the First American Bank, but the evidence is not conclusive as to when the debt was incurred, or who is responsible. Mr. Loyd has been placed in willful contempt previously by this Court, and has been punished accordingly.
>
> Perhaps the parties could agree upon a payment schedule by Mr. Loyd for the IRA, taxes, and the alimony that had accrued before Mr. Loyd's motion for modification was filed in September, 1993. Since Mr. Loyd is not capable of purging himself of contempt, the Court has reconsidered its decision that it would not consider Mr. Loyd's motion for modification until he did so. Further, Mr. Loyd is in arrears as per Order of February 7, 1994, in the amount of $1,412.50 [sic], and this figure should be considered in any payment schedule.
>
> Future alimony from February 7, 1994, will be considered after any payment proposal is presented to the Court if such can be reached between the parties."

(The February 7, 1994 order makes it clear that the arrearage referred to was $14,125, rather than $1,412.50.) The February 3, 1995 order noted that, during the period after the December 1, 1994 findings of fact, Ex-Wife had renewed a previous settlement offer to Husband. Husband refused the offer and did not make any counteroffer or proposal, in contravention of the trial court's directions. The trial court later made its order final pursuant to Tenn. R. Civ. P. 54.02. It is from this order Ex-Wife now appeals.

Our review of findings of fact by the trial court in this case is *de novo* upon the record, with a presumption of correctness unless the evidence preponderates otherwise. No presumption of correctness attaches to the trial court's holdings of law. Tenn. R. App. P. 13(d); *Abney v. Abney*, 61 Tenn. App. 531, 541, 456 S.W.2d 364, 369 (1970).

The law regarding contempt of court for failure to pay alimony is well settled in Tennessee. Tenn. Code Ann. § 29-9-102(3) provides that Tennessee courts may find contempt of court for "[t]he willful disobedience or resistance of any officer of the said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of said courts." A spouse who refuses to pay court-ordered alimony can be incarcerated for contempt until he purges the contempt by paying the arrearage. *Loy v. Loy*, 32 Tenn. App. 470, 479, 222 S.W.2d 873, 877 (1949). Generally, however, the spouse cannot be incarcerated for contempt if he does not have the present ability to pay the alimony. *Bradshaw v. Bradshaw*, 23 Tenn. App. 359, 362, 133 S.W.2d 617, 619 (1939). If he is able to perform in part, the court may incarcerate him until he performs to that extent. *Mowery v. Mowery*, 50 Tenn. App. 648, 654, 363 S.W.2d 405, 408 (1962).

To avoid being held in contempt, the spouse claiming an inability to pay alimony bears the burden of demonstrating that "acting in good faith, and with an honest purpose to comply with the order of the court, he was unable to do so." *Bradshaw,* 23 Tenn. App. at 363-64, 133 S.W.2d at 620. Such a spouse cannot willfully bring about his own inability to pay the alimony and then use that inability to avoid being held in contempt. *Id.* at 362-363, 133 S.W.2d at 619-20. For example, a spouse cannot refuse to pay alimony while he is employed and then, after he has lost his job and spent all his money, use his poverty as an excuse for being unable to pay. *Id.* at 362, 133 S.W.2d at 619. In *Bradshaw*, the Court noted:

> "If he [the husband] can establish that he is actually unable to comply with the decree and that such inability has not been brought about purposely as a result of his own intentional conduct, such facts will constitute a perfect defense to the application to have him punished for contempt. Furthermore, even after commitment he is entitled to be discharged if he can establish bona fide inability to pay. But when his ability to pay may be drawn from the evidence and reasonable deductions therefrom, it is not erroneous to decline to discharge him from confinement. Where it appears that he once possessed the means of complying, but wilfully impoverished himself with the idea of thus defeating the allowance, it is evident that his inability to pay cannot constitute a defense. . . . It seems to be the general practice, however, not to accept present lack of money as a defense for failure to pay past instalment of alimony if there has been any material income."

*Id.* at 363, 133 S.W.2d at 619-20 (quoting with approval 17 *Am. Jur.* § 671, at 510-11). In addition, "inability to pay by reason of obligations incurred as a result of remarriage is no defense to a contempt proceeding for failure to pay alimony to a former wife." *Johnson v. Johnson*, 499 S.W.2d 268, 271 (Tenn. App. 1973).

7

Husband's conduct in this case demonstrates a systematic determination not to pay any of the alimony ordered. The record shows that Husband has never made a single payment to Ex-Wife, even prior to any claim of inability to pay. The trial court noted that there were no restrictions on Husband entering into a competitive business, and from that fact concluded that Husband had not willfully depleted the original business awarded to Ex-Wife. While Husband's conduct did not violate specific prohibitions, it clearly evidenced his intent to keep Ex-Wife from acquiring any assets of significant value. This is further confirmed by Husband's conduct with regard to the house awarded to Ex-Wife in this Court's previous decision. Husband finally turned over the house to Ex-Wife, but not before stripping it of items such as built-in appliances and cabinets and otherwise vandalizing it, demonstrating an intent to diminish the value of the house before giving possession to Ex-Wife.

In addition, Husband has consistently put assets in the names of other persons or entities in order to place them out of reach of Ex-Wife. Half of the stock of his new business was given to Wife in exchange for a used vehicle of minimal value. Another 33% of the stock was given to a new employee, leaving Husband with only 17% of the stock in his name. The home he shares with Wife is titled in Wife's name, although Husband includes the monthly house payment among the joint debts listed to demonstrate his inability to pay. Meanwhile Husband purchased items such as fencing, paint, and carpeting for his new home with Wife. Vehicles utilized by Husband for personal as well as business use were purchased by his new competing business, thereby placing them beyond Ex-Wife's reach.

This course of conduct must be considered as background to the evidence of Husband's alleged inability to pay. Central to Husband's claim of inability to pay are his physical difficulties and his decreased income from his new business. Husband claims that various physical problems, such as an arthroscopic surgical procedure performed on his knees, pain in his back, and a heart catheterization, have diminished his ability to do the physical work associated with his business. The record includes no medical documentation or physician's testimony to support his claim. However, even if his claim of physical impediments is deemed credible, by his own testimony it does not prevent him from contributing substantially to the business and earning a living, albeit with assistance from other employees.

Moreover, the history of income from the new business to Wife, as well as Husband, must

be considered. Since shortly after this Court's previous decision ordering Husband to pay alimony to Ex-Wife, the business has almost invariably paid Wife a greater monthly salary than Husband, although her work is in a support role, doing bookkeeping and assisting Husband, and she was also employed elsewhere during much of the time. This is incongruous at best. Further, under Husband's direction, the salaries paid to him and to Wife from the business appear to fluctuate in response to Husband's needs. For example, Husband had the business double his salary during the month he had the arthroscopic procedure on his knees. In addition, Husband directed the business to significantly increase his salary within two months after the trial court released him from incarceration, although he was released because he allegedly could not make payments on his arrearage to purge himself of contempt. Shortly after that, Husband increased Wife's salary from $250 per week to $430 per week. Husband testified that this increase was "[t]o try to offset our outgoing expenses and to keep from having to file bankruptcy."

During this time Husband has not made a single alimony payment to Ex-Wife. When directed by the trial court to submit a proposed payment schedule, he has refused to do so.

As noted in **Bradshaw**, the burden of proof is on Husband "to show that, acting in good faith, and with an honest purpose to comply with the order of the court, he was unable to do so." **Bradshaw**, 23 Tenn. App. at 363-64, 133 S.W.2d at 620. From our review of the record, Husband has failed to carry this burden. Indeed, it is clear from the record that Husband has depleted the value of any assets turned over to Ex-Wife, titled assets within his control in the name of his new wife or his new business to keep them out of Ex-Wife's reach, failed to attempt any alimony payments prior to the onset of his alleged medical problems, exaggerated the impact of his physical difficulties, and manipulated the stream of income from his new business.

The record demonstrates that Husband has the ability to perform, at least in part, his court-ordered obligation to make payments to Ex-Wife and to purge himself of contempt. Husband has failed to carry his burden of proof that, in good faith, he is unable to comply. The evidence indicates that any inability to pay is primarily a result of Husband's willful conduct. Under these circumstances, Husband's claimed inability to pay cannot be used as a defense to incarceration for

9

contempt. In the past, this Court, quoting **Gibson's Suits in Chancery**, has noted the following:

> "The power to punish for contempt is one of the highest prerogatives of a Court of Justice; and, upon its bold and prudent exercise, depend the respect, the dignity, and efficiency of Courts as arbiters of human rights. The mandates of a Court of Chancery must in all cases be obeyed, according to the spirit of the decree, promptly, faithfully and without question or evasion. The party, upon whom the order or command of the Court operates, is not allowed to speculate upon the Equity of the bill, or the legality or regularity of the order, or decree, or of the writ issued thereon; but his simple duty is to obey; and when he disobeys it is a duty the Court owes, to itself and to the public, to punish him at once."

**Johnson v. Johnson**, 499 S.W.2d 268, 271-72 (Tenn. App. 1973).

The trial court shall order a payment plan for the reduction and eventual elimination of the arrearage, which includes $14,125 in past-due alimony and division of property payments, $11,301.96 for the liquidated IRA, and any back taxes on the marital residence for which Husband is responsible. Based on the amount of salary Husband received prior to this Court's previous decision, $2,460.20 per month, the plan should require payments of at least $300 per month. This payment shall be in addition to the $412.50 per month payment toward the division of property and the $1,000 per month alimony previously ordered by this Court.[1]

If Husband fails to abide by the payment schedule ordered by the trial court, he should be immediately incarcerated for contempt, unless he presents very substantial new evidence to the contrary.

Wife has requested costs and attorney's fees for this appeal. We find such an award appropriate and remand the case to the trial court for determination of an amount.

In sum, we find that the evidence preponderates against the trial court's finding that Husband is unable to purge himself of contempt, and this finding is reversed. The case is remanded to the trial court to establish a payment schedule consistent with this Opinion and to enforce the payment schedule by incarceration for contempt if necessary. The trial court is further directed to determine the appropriate amount of costs and attorney's fees to be awarded to Ex-Wife for this appeal.

---

[1] In its Final Order on Motion for Contempt, the trial court indicated a willingness to consider Husband's motion for a reduction in alimony. Therefore, the trial court has not yet issued an order on reduction of alimony and the only issue properly before this Court involves Husband's contempt for not paying the arrearage owed Ex-Wife. Accordingly, we do not address the issue of reduction in alimony.

The decision of the trial court is reversed, and the case is remanded for further proceedings consistent with this Opinion. Costs are taxed to Appellee, for which execution may issue if necessary.

                               **HOLLY KIRBY LILLARD, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**ALAN E. HIGHERS, J.**

11